**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **CRIMINAL NO. 22-315** |
| **v.** | : | **(JUDGE MANNION)** |
| **DAVID DIPPRE, JR.,** | : | |
| **Defendant.** | : | |

## MEMORANDUM

Presently before the court is defendant's motion to suppress evidence. (Doc. 17). The defendant filed a brief in support of his motion. (Doc. 18). The government filed a brief in opposition. (Doc. 23). The court held an evidentiary hearing on the motion to suppress evidence on June 29, 2023. Following the hearing, the court ordered post-hearing briefing. (Doc. 31). The defendant filed a post-hearing brief in support. (Doc. 36). The government filed a post-hearing brief in opposition. (Doc. 35). As such, the matter is now ripe for disposition.

## I. BACKGROUND

In August of 2022, the United States Marshal's Fugitive Task Force Unit in Scranton, Pennsylvania began an investigation into Harold Tittle. Officer Maximillian Fada was in charge of the fugitive investigation. A state

arrest warrant was issued for Tittle. Tittle's driver's license indicated his address as 203 Flame Drive, Long Pond. Additionally, Tittle's State Parole Agent confirmed that Tittle had identified 203 Flame Drive as his planned home[1].

Investigators learned that Tittle frequented Sunny's Food Mart, a gas station and convenience store near the 203 Flame Drive address. Officer Fada went to Sunny's Food Mart and showed the store manager a photograph of Tittle. The owner of Sunny's Food Mart recognized Tittle, and allowed Office Fada to review surveillance footage from the store. He discovered Tittle with David Dippre inside the store on August 31, 2022. After exiting the store, the two got into a Volkswagen sedan driven by Dippre. The Volkswagen exited the gas station and convenience store in the direction of 203 Flame Drive. After reviewing the video at Sunny's Food Mart, Officer Fada drove past 203 Flame Drive, but did not observe the Volkswagen from the surveillance video at the residence. Then on September 1, 2022, Officer Fada drove by the 203 Flame Drive property and observed the Volkswagen from the surveillance video parked at the property.

After observing the Volkswagen at 203 Flame Drive, the Marshals Fugitive Task Force Unit attempted to arrest Tittle on the State Warrant at

---

[1] This address was ultimately not approved by the State Parole Board.

203 Flame Drive with the assistance of the Pocono Mountain Regional Police Department ("Pocono Mountain Police").

The 203 Flame Drive property contains a main structure and several other buildings. The main structure resembles a more traditional residence. The other structures on the property are a garage, trailers, and a shed. When the task force arrived at the property, they cleared the main structure without finding anyone inside. Pocono Mountain Police Officer Schneider was stationed on the perimeter of the property near a white trailer. Officer Schneider spotted a male exiting the white trailer he was stationed near. This male would later be identified as David Dippre, Jr. For officer safety, Officer Schneider ordered Dippre to show his hands and walk backwards towards his position. While this was occurring, Officer Schneider spotted a woman leaving the same trailer. The woman exited the trailer, leaving the door open, and began walking toward the main residence. Similarly, Officer Schneider gave her commands to stop. Another officer moved her aside.

Other Task Force Officers ("TFOs") heard orders being given in the rear of the property and moved toward the trailer from the main residence. The TFOs asked Dippre if Harold Tittle was in the trailer. Dippre asked if the officers meant "Skip," a nickname Harold Tittle was known to use. The TFOs confirmed they were referring to "Skip." Dippre informed them that Tittle was

not in the trailer. The TFOs then asked Dippre if they could search the trailer for Tittle to ensure he was not in there. Dippre responded and gave the TFOs permission to search the trailer for Tittle. As the TFOs then approached, the lead Officer DeNucci noticed a powdery substance inside the trailer and immediately stopped. He informed the other TFOs of this observation through the open door while still outside the trailer and standing at the base of the entrance. Officer DeNucci then asked a member of the Pocono Mountain Police to confirm what he was observing to be suspected narcotics.

After confirming the presence of illegal narcotics, Dippre was escorted to a Pocono Mountain Police vehicle where he provided a statement regarding the drugs in his trailer and gave permission for the police to search the trailer and seize the evidence. Dippre also signed a consent to search form. (Doc. 23-4).

## II. LEGAL STANDARD

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. Lange v. California, 141 S.Ct. 2011, 2017 (2021).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

- 4 -

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753-55 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Generally, a search "requires a warrant supported by probable cause." Carpenter v. United States, 138 S.Ct. 2206, 2213 (2018) (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." United States v. Davidson, 936 F.2d 856, 859 (6th Cir.

1991) (internal quotations omitted). An affidavit in support of a search warrant "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists." United States v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996).

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998). "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." U.S. v. Ellis, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing Katz v. United States, 389 U.S. 347, 361 (1967)). "Under Katz, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy." Id. (citations omitted).

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" United States v. Lara-Mejia, 482

F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting <u>United States v. Calandra</u>, 414 U.S. 338, 347 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" <u>Id.</u> "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" <u>Id.</u> (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." <u>U.S. v. Johnson</u>, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." <u>Id.</u> (citation omitted). Stated otherwise, where the search or seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred and that it was supported by reasonable suspicion." <u>U.S. v. Lowe</u>, 791 F.3d 424, 432 n. 4 (3d Cir. 2015). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." <u>Kentucky v. King</u>, 563 U.S. 452, 459 (2011).

### III. DISCUSSION

#### a. Warrantless Search of Dippre's Trailer

Dippre states that he "owned the camper trailer on the property of 203 Flame Drive." (Doc. 36, p.16). "As the government succinctly puts it "A parolee who is subject to parole search conditions and is in violation of conditions of his supervised release does not have "an expectation of privacy that society would recognize as legitimate." <u>Samson v. California</u>, 547 U.S. 843, 852 (2006). Dippre attempts to argue that as an overnight guest he maintains an expectation of privacy through that status alone. "Fourth Amendment rights as a guest are limited to those that he could assert with respect to his own residence." <u>United States v. Taylor</u>, 482 F.3d 315, 318 (5th Cir. 2007). This means Dippre's expectation of privacy cannot exceed the rights he possesses within his own residence. He cannot claim a broader expectation of privacy simply because he is also an overnight guest.

Delving into the facts surrounding this matter, an exception to the warrant requirement is consent from the defendant. <u>United States v. Williams</u>, 898 F.3d 323, 329 (3d Cir. 2018) ("A search conducted with consent is one such 'established exception'"). As both Officer DeNucci's and Fada's statements and testimony indicate Dippre was initially asked to give oral consent to search the trailer for Title. (Doc. 32 22:1-5; 42:18-23). After

being placed in a patrol vehicle and given his Miranda warnings, Dippre was asked by officers if they could search the trailer and was advised that the officers would seek a search warrant if he did not consent. Dippre responded by stating, "I know you can, that's why I said to you guys 'go in'…" (Doc. 23-2, 5:13). Dippre's statement provides further context that he previously told officers they had permission to go into the camper. This permission to search the camper led officers to discover illegal narcotics inside the camper.

Beyond Dippre's consent to search the camper for Tittle, the door to the camper was left open after the female exited the camper. As such, when Officer DeNucci approached the camper's open door, he observed what appeared to be a brown powdery substance before ever entering the camper. (Doc. 32 85:6-14). Officer DeNucci then called for a Pocono Mountain Police officer to look into the trailer and confirm what he was seeing. After confirming the presence of drugs in the trailer, Dippre was taken back to a patrol vehicle.

While Dippre attempts to raise a Fourth Amendment challenge to the police's presence at the front of his camper. The Supreme Court has explained that an individual claiming Fourth Amendment protection must "demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525

U.S. 83, 88 (1998). The defendant, as a parolee, "ha[s] [a] severely diminished expectation[] of privacy by virtue of [his] status alone." <u>Samson v. California</u>, 547 U.S. 843, 852 (2006). Dippre does not have an expectation of privacy over the entire property. As he states himself, the trailer is his property, but he does not own the rest of the property. As such, Dippre's expectation of privacy starts and stops within the four walls of the trailer. As such, officer only needed reasonable suspicion to search the trailer. <u>United States v. Venson</u>, No. 07-364, 2009 WL 1565736, *7 (W.D. Pa. June 3, 2009).

### b. Police Presence on Property

Dippre next argues that the police were not able to be present on the property as the warrant they received was an improper warrant. Defendant asserts this argument in an attempt to create a fruit of the poisonous tree style argument because if the search of his trailer is deemed valid, then he must attempt to invalidate the police's underlying presence on the property.

The police were able to be on the property to execute a parole warrant for Tittle. The police believed Tittle was present on the property based upon: (1) footage from Sunny's Food Mart that contained Tittle driving in the same Volkswagen later found at 203 Flame Drive; (2) as the Volkswagen left Sunny's Food Mart, it drove in the direction of 203 Flame Drive; (3) the

officers arrived at the property around mid-day; and (4) as Title absconded from the halfway house he was supposed to be residing in, officer's reasonably believed the address he listed on his driver's license and attempted to reside at upon his release would be where he would be at. See United States v. Veal, 453 F.3d 164, 168 (3d Cir. 2006); United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir. 1995) (noting car connected to defendant was parked at the property); United States v. Magluta, 44 F.3d 1530, 1538 (11th Cir. 1995) ("The presence of a vehicle connected to a suspect is sufficient to create the inference that the suspect is at home."). In a common sense approach and in the totality of the circumstances known to the officers, they had probable cause to believe Tittle resided at 203 Flame Drive and would actually be there at the time of the arrest.

### c. Good Faith

Assuming *arguendo* that the defendant has standing to challenge the officers' presence on the property. Officers were present at the 203 Flame Drive property pursuant to a Parole Board arrest warrant.

Officer Fada explained the process for arresting an individual who has violated conditions of their parole. Once a parole agent determines that the individual violates a condition of their parole, they notify their supervisor and

complete a 62A form also known as a Delinquency Request Form. The 62A form is used to request a warrant be issued for the parolee's violation. A supervisor then reviews the form and can approve or deny it. Once approved, the form is sent to the Special Projects Division of the Parole Board in Harrisburg where the information is entered into the National Criminal Information Center ("NCIC") database, and a warrant is issued for the parolee's arrest.

Officer Fada received the case after the parole agent review process was conducted. Officer Fada stated that he verified there was still an active warrant issued for Tittle's arrest in NCIC as he was beginning his initial review of the case. Additionally, when describing the results of the team's search of the main residential structure at 203 Flame Drive, Officer Fada stated, "We were negative for contacting Mr. Tittle, who I had the arrest warrant for on that day at the main structure." (Doc. 32 16:9-11). Drawing from Officer Fada's statement, the warrant was still active in the system on the day the task force officers and Pocono Mountain Police arrived at 203 Flame Drive.

Dippre argues good faith does not apply here because the Third Circuit has explained the exception applies when a "neutral and detached, duly

- 12 -

appointed magistrate judge" makes a probable cause finding. <u>United States v. Werdene</u>, 883 F.3d 204, 215 (3d Cir. 2018).

Defendant acknowledges that even the Third Circuit has explained under <u>Werdene</u>, that a warrant that was void *ab initio* still provided grounds for the good faith exception. 883 F.3d at 215. While the defendant seeks to narrow the Third Circuit's holding to their use of the phrase "neutral and detached, duly appointed magistrate judge," the Circuit went further in explaining the good faith exception is applicable despite a variety of issues arising with the warrant. <u>Werdene</u>, 883 F.3d at 216 (citing <u>Davis</u>, 564 U.S. at 241 [ ] (good-faith exception applicable when warrant is invalid due to later-reversed binding appellate precedent); <u>Herring</u>, 555 U.S. at 147-48, [ ] (undiscovered error in police-maintained database); <u>Arizona v. Evans</u>, 514 U.S. 1, 14-16, [ ] (1995) (undiscovered error in court-maintained database); <u>Illinois v. Krull</u>, 480 U.S. 340, 349-50 [ ] (1987) (subsequently overturned statute); <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 990, [ ] (1984) (judicial clerical error on warrant); <u>Leon</u>, 468 U.S. at 922, [ ] (later-invalidated warrant)). As the Third Circuit explained in <u>Werdene</u>:

> [I]n each of the Supreme Court's good-faith exception cases, "the Court has not focused on the type of Fourth Amendment violation at issue, but rather confined the 'good-faith inquiry ... to the objectively ascertainable question *whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.*'" <u>Horton</u>, 863 F.3d at 1051

- 13 -

(quoting <u>Herring</u>, 555 U.S. at 145, 129 S.Ct. 695). We therefore hold that the good-faith exception applies to warrants that are void *ab initio* because "the issuing magistrate's lack of authority has no impact on police misconduct, if the officers mistakenly, but inadvertently, presented the warrant to an innocent magistrate." <u>Master</u>, 614 F.3d at 242.

<u>United States v. Werdene</u>, 883 F.3d 204, 216–17 (3d Cir. 2018) (emphasis added). Furthermore, a search of NCIC to discover a valid warrant constitutes good faith. <u>Capone v. Marinelli</u>, 868 F.2d 102, 105 (3d Cir. 1989) (finding it was reasonable for officer to rely on NCIC bulletin that contained a warrant for defendant's arrest); <u>United States v. Munoz</u>, 150 F.3d 401, 411-12 (5th Cir. 1998) (finding officer's knowledge of an outstanding warrant through NCIC coupled with a reasonable belief that defendant was at the address constituted entering the residence to arrest the defendant); <u>United States v. Roper</u>, 702 F.2d 984, 989 (11th Cir. 1983) (involving an officer verifying NCIC warrant for a suspect's probation violation); <u>United States v. McDonald</u>, 606 F.2d 552, 553-54 (5th Cir. 1979) ("the cases uniformly recognize that NCIC printouts are reliable enough to form the basis for the reasonable belief which is needed to establish probable cause for arrest").

As such, officers here relied on NCIC to discover a valid warrant. Officers had no reason to believe the warrant was obtained improperly.

- 14 -

Therefore, the good faith exception would also be applicable. As such, for the reasons stated above, the motion to suppress will be **DENIED**.


                                        *s/ Malachy E. Mannion*
                                        **MALACHY E. MANNION**
                                        **United States District Judge**

**DATE: September 27, 2023**
22-315-01